UNITED STATUS DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JOSE RAMIRO GARZA CANTU,

Plaintiff,

vs.

BILLY R. FLANIGAN, UNKNOWN/
UNNAMED DEFENDANT, and
DOES 1 through 10, inclusive,

Defendants.

---



CV 05 3580

Docket No.

COMPLAINT AND
DEMAND

1) **DEFAMATION;**
2) **INTENCIONAL INTERFERENCE**
3) **INTENTIONAL INTERFERENCE**
   **WITH ECONOMIC ADVANTAGE**
4) **NEGLIGENT INTERFERENTE**
   **WITH ECONOMIC ADVANTAGE**

Jennifer L. Ploetz, Esq. (JP6975)
SMITH, SOVIK, KENDRICK & SUGNET, P.C.
Attorneys for Plaintiff Jose Ramiro Garza Cantu
250 South Clinton Street
Suite 600
Syracuse, New York 13202
Telephone: 315.474.2911
Facsimile:  315.474.6015

Plaintiff Jose Ramiro Garza Cantu ("Plaintiff"), through his attorneys, complains and alleges as follows:

### OVERVIEW

1.      This is an action to recover damages caused by defendant Billy R. Flanigan's ("Defendant" or "Defendant Flanigan") repeated defamation of Plaintiff and Defendant's numerous attempts to interfere with valid and existing contracts between Plaintiff and third parties.  Each of Defendant's actions as set forth below was conducted with malice and oppression, and was specifically designed to interfere with and damage Plaintiff, his reputation and his business.

### PARTIES

2.      Plaintiff is now, and at all times mentioned herein has been, a Mexican citizen, residing in Mexico City, Mexico.  Also, Plaintiff is the President and Chief Executive Officer of Servicio Industrial Especializado, S.A. de C.V., a corporation organized and existing under the laws of the United States of Mexico, with its principal place of business in Mexico City, Mexico.  Servicio Industrial Especializado, S.A. de C.V. is an oil service company and a major service provider to Petroleos Mexicanos ("Pemex"), a decentralized agency of the Mexican government.  Not surprisingly, through its representative Pemex, the Government of Mexico owns any and all rights to any oil, including crude oil, whether at land or sea, in and throughout Mexico.

3.      Defendant Billy R. Flanigan is a citizen of the United States of America.  On information and belief, Defendant resides and conducts business in Houston, Texas. However, the conduct of which Plaintiff complains occurred in New York, and within this judicial district.

2

4.     On information and belief, Defendant Flanigan's acts as described herein have been at the direction and with the help of a currently unknown and unnamed individual (hereafter, "Unknown Defendant").   Defendant Flanigan and Unknown Defendant harbor extreme ill will toward Plaintiff, and have engaged in the acts described herein to damage and harm Plaintiff, his reputation, his business, and his life.   Whenever reference is made herein to Defendant Flanigan, such allegations and reference shall also be deemed to mean the acts of Unknown Defendant.   Defendant Flanigan and Unknown Defendant are jointly and severally liable to Plaintiff as alleged hereunder for all damages, attorneys' fees, costs and such other sums as are sought and may be awarded by this Court.

5.     Plaintiff is ignorant of the true names and capacities of defendants sued herein as DOES 1-10, inclusive, and therefore sues these defendants by such fictitious name. Plaintiff will amend this complaint to allege their true names and capacities when the same are ascertained.   Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named defendants is responsible in some manner for the occurrences alleged herein, and that Plaintiff's damages were proximately caused by their conduct.

6.     Plaintiff is informed and believes, and on such information and belief alleges, that all the acts and failures to act alleged herein were duly performed by and attributable to all defendants, each acting as agent, co-conspirator, alter ego, associate, co-venture and/or under the direction and control of the others, and that said acts and failures to act were within the scope of said agency, employment, alter ego, direction, co-venturing and/or control of the others.   To the extent that said conduct was engaged by Defendant Flanigan and the Unknown Defendant, the remaining defendants participated in, benefited by, confirmed and/or ratified said conduct.   Whenever and wherever reference is made in this complaint to any acts of Defendant Flanigan, such allegations and references shall also be deemed to mean the acts of the Unknown Defendant and each and every remaining DOE defendant acting individually, jointly or severally.   All defendants, collectively, and each defendant

3

separately, are jointly and severally liable to Plaintiff as alleged hereunder for all damages, attorneys' fees, costs and such other sums as are sought and may be awarded by the United States District Court for the Eastern District of New York.

## DIVERSITY JURISDICTION

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (a)(2) (complete diversity of citizenship).  As set forth in more detail below, Plaintiff is a citizen of Mexico, "a foreign state" within the meaning of 28 U.S.C. § 1332(a)(2), and Defendant Flanigan is a citizen of Texas.

8.    The citizenship of Unknown Defendant and "DOES 1 through 10" is disregarded for determining citizenship.  *Cf.* 28 U.S.C. § 1441(a) (For removal purposes, "[t]he citizenship of defendants sued under fictitious names shall be disregarded.").

### IV.

## AMOUNT IN CONTROVERSY

9.    Plaintiff seeks more than One Hundred Million Dollars ($100,000,000) in damages resulting from the acts of Defendant Flanigan as set forth herein, and Defendant's acts have caused substantial damage to Plaintiff's personal and business reputation, and good will.  Thus, Defendant Flanigan's calculated, malicious and nefarious conduct has damaged Plaintiff and his companies well in excess of the jurisdictional minimum of $75,000.  *See* 28 U.S.C. § 1332(a).

## VENUE

10.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (a) because "a substantial part of the events … giving rise to the claim occurred" in this judicial district and because, as set forth below, Defendant Flanigan is subject to personal jurisdiction herein.

## FACTUAL BACKGROUND

11.    Defendant Flanigan wanted something from Pemex – money.  However, a U.S. appellate court held that Defendant was not entitled to recover from Pemex, and Pemex

would not let Defendant extort it.   Therefore, Defendant Flanigan decided and set out to damage Plaintiff's reputation in order to coerce his cooperation against Pemex.

12.     In furtherance of their plan of extortion, Defendant Flanigan and Unknown Defendant fraudulently created and falsified various documents upon which they could base their defamatory statements.

13.     At all times, Defendant Flanigan and Unknown Defendant knew or should have known that the documents upon which they based their claims were false.

14.     Defendant Flanigan then created what non-lawyers might mistake for a legal brief.  Defendant labeled this document an "Amicus Brief" (hereafter, the "Document"). Defendant  published the Document in New York, and elsewhere.

15.     At all relevant times, Defendant Flanigan knew or recklessly disregarded that the Document was filled with lies and misrepresentations.  However, Defendant Flanigan's only intention was to use the false accusations in the Document to damage and coerce Plaintiff.

16.     Prior to filing the Document and the false exhibits with the U.S. District Court for the Eastern District of New York, Defendant Flanigan and Unknown Defendant sent the Document to  a number of Mexican newspapers and magazines, including but not limited to "Processo," "El Norte," "Tabasco Hoy" and "Semanario Debate," which are widely circulated papers and magazines in Mexico City, the capital of the United States of Mexico, and throughout the country.

17.     A true and correct copy of the "Processo" article is attached hereto as Exhibit A.

18.     In the written Document and in verbal statements, Defendant Flanigan misrepresented and made the following defamatory remarks to various third parties, including but not limited to the Mexican media:

    a. Plaintiff is the "Operations Manager" for a "Racketeering Enterprise" within the meaning of the Federal Racketeering Influenced and Corrupt Organizations ("RICO") statutes, 18 U.S.C. § 1962, *et seq.*;

    b. Plaintiff, through large construction contracts with companies such as "Brown & Root, Halliburton and Dannenbaum Engineering," and alleged "affiliations with Government Officials (sic) in Saudi Arabia, Pakistan, Mexico and Iraq along with members of the Gulf Drug Cartel" has laundered large sums of drug money;

    c. Plaintiff, through his illegal conduct, is "one of the causes for consumers having to pay" more than $2.00 for a gallon of gasoline in the United States;

    d. Plaintiff had a long standing relationship with then Iraqi President Saddam Hussein. After Desert Storm, Plaintiff circumvented sanctions issued by both the United States and the United Nations by brokering a deal with Iraq and Saddam Hussein to purchase Iraqi crude oil, worth $18.90 per barrel, for $7.41 per barrel. Plaintiff would then "blend" the Iraqi crude oil with Plaintiff's own oil, which was then "transhipped and refined as Mexican crude [oil] in Gulf Coast refineries";

    e. Plaintiff smuggled Mexican crude oil into the United States;

    f. Plaintiff and his companies were awarded the "Cantarell Project" contracts, totaling $1.5 billion, only because Plaintiff was involved with the payment of a $30 million bribe to then Mexican President Ernesto Zedillo;

    g. Plaintiff heads "the Ramiro Garza Cantu crime family"; and,

    h. Plaintiff committed various criminal acts such as "mail fraud, wire fraud, tampering, obstruction of commerce, unlawful travel and theft by extortion."

  19. Defendant Flanigan and Unknown Defendant knew or recklessly disregarded that the above statements were and are false at the time they were made and at all relevant times herein.

20.     Based on the gravity of the defamatory remarks that Defendant Flanigan made in the Document and verbally to various third parties, a number of Mexican newspapers have reprinted and published Defendant Flanigan's false statements just as Flanigan intended when he defamed Plaintiff.

21.     Defendant Flanigan has been informed that the exhibits which he claims to possess in support of his allegations are false.  However, Defendant Flanigan has ignored these warnings and continues to utilize these fraudulent documents to defame and slander Plaintiff.

22.     Defendant Flanigan's misrepresentations and defamatory statements, each of which imports alleged criminal conduct to Plaintiff personally, as well as his businesses, constitute libel *per se* and slander *per se*.

23.     Not surprisingly, numerous third party competitors of Plaintiff have presented Defendant Flanigan's defamatory remarks to Pemex and other business partners in an attempt to divert business from Plaintiff to themselves.

24.     Consequently, business contracts have been awarded to Plaintiff's competitors which would have normally been given to Plaintiff but for Defendant's defamatory remarks.

25.     Plaintiff has suffered other negative business consequences as a result of Defendant's defamatory remarks which has cost Plaintiff hundreds of millions of dollars.

26.     On or about January 10, 2005, *after* making his defamatory statements to the Mexican media and other sources, Defendant Flanigan informally submitted the Document to the chambers of United States Magistrate Judge Robert M. Levy at the United States District Court for the Eastern District of New York, Brooklyn Division. Tellingly, the

Document which was eventually submitted to Magistrate Judge Levy did not list Plaintiff as a "defendant" on the caption.  In other words, Defendant Flanigan removed Plaintiff's name from the Document's front caption page *only after sending it to the Mexican media and other sources.*

27.     Notwithstanding the fact that Defendant's remarks are lies and the fact that his remarks continue to cause substantial harm to Plaintiff, Defendant continues to repeat his defamatory statements.  Moreover, Defendant has expressly told various individuals that he has no idea as to whether or not his accusations are true or false.  Indeed, Defendant Flanigan has admitted that he only made the defamatory remarks to pressure Plaintiff to help him obtain money.

## FIRST CAUSE OF ACTION

### (Defamation - Against All Defendants)

28.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 27 above, as though set forth in full below.

29.     Defendant Flanigan and Unknown Defendant fraudulently created and falsified various documents in order to disparage and coerce Plaintiff.

30.     Defendant Flanigan and Unknown Defendant know that these documents are false or are acting with a reckless disregard for the truth or falsity of these documents.

31.     Defendant Flanigan sent an intentionally misleading "legal" document to the Mexican media and other sources in order to defame and humiliate Plaintiff.

32.     Defendant published the Document in New York.

33.     Defendant Flanigan knew or should have known that the Document was filled with lies and misrepresentations.  However, Defendant Flanigan's intention was to use the false accusations to harm Plaintiff.

34.     In the written Document and in verbal statements, Defendant Flanigan misrepresented and made the following defamatory remarks to various third parties, including but not limited to the Mexican media:

a.      Plaintiff is the "Operations Manager" for a "Racketeering Enterprise" within the meaning of the Federal Racketeering Influenced and Corrupt Organizations ("RICO") statutes, 18 U.S.C. § 1962, *et seq.*;

b.      Plaintiff, through large construction contracts with companies such as "Brown & Root, Halliburton and Dannenbaum Engineering," and alleged "affiliations with Government Officials (sic) in Saudi Arabia, Pakistan, Mexico and Iraq along with members of the Gulf Drug Cartel" has laundered large sums of drug money;

c.      Plaintiff, through his illegal conduct, is "one of the causes for consumers having to pay" more than $2.00 for a gallon of gasoline in the United States;

d.      Plaintiff had a long standing relationship with then Iraqi President Saddam Hussein. After Desert Storm, Plaintiff circumvented sanctions issued by both the United States and the United Nations by brokering a deal with Iraq and Saddam Hussein to purchase Iraqi crude oil, worth $18.90 per barrel, for $7.41 per barrel. Plaintiff then "blended" the Iraqi crude oil with Plaintiff's own oil, which was then "transhipped and refined as Mexican crude [oil] in Gulf Coast refineries";

e.      Plaintiff smuggled Mexican crude oil into the United States;

f.      Plaintiff and his companies were awarded the "Cantarell Project" contracts, totaling $1.5 billion, only because Plaintiff was involved with the payment of a $30 million bribe to then Mexican President Ernesto Zedillo;

g.      Plaintiff heads "the Ramiro Garza Cantu crime family"; and,

h.      Plaintiff committed various criminal acts such as "mail fraud, wire fraud, tampering, obstruction of commerce, unlawful travel and theft by extortion."

35.     Defendant Flanigan and Unknown Defendant knew or recklessly disregarded that the above statements were and are false at the time they were made and at all relevant times mentioned herein.

36.     Defendant Flanigan sent the Document to the various newspapers and magazines as listed above, and other public sources, and made the defamatory remarks to each of them, knowing or recklessly disregarding that:

a.     The Document was not a complaint or legal pleading;

b.     The Document was based on lies, misrepresentations and fraudulently created false exhibits; and,

c.     The Document listed Plaintiff as a "defendant" on the caption, even though Defendant Flanigan intended to remove and subsequently did remove Plaintiff from the Document *after sending it to the Mexican media and other sources.*

37.     Defendant Flanigan's misrepresentations and defamatory statements, each of which imports alleged criminal conduct to Plaintiff personally, as well as his businesses, constitute libel *per se* and slander *per se*.

38.     Not surprisingly, numerous third party competitors of Plaintiff have presented Defendant Flanigan's defamatory remarks to Pemex and other business partners in an attempt to divert business from Plaintiff to themselves.

39.     Based upon Defendant Flanigan's false representations to various third parties, Plaintiff's personal reputation, business reputation and goodwill have been damaged among his key business customers and partners, financial investors, consultants and others who have heard or seen Defendant Flanigan's defamatory statements.

40.     The false representations made by Defendant Flanigan have injured Plaintiff and his companies in his profession, trade, business and personal reputation, by falsely claiming that Plaintiff has engaged and continues to engage in improper, unethical and illegal business practices and criminal activity.

41.    As a direct and proximate result of Defendant Flanigan's actions, Plaintiff has and will continue to suffer damages in an amount to be proved at trial, but in an amount in excess of this Court's jurisdictional requirements.

42.    In doing the things herein alleged, Defendant Flanigan acted willfully, with malice, in conscious disregard of Plaintiff's rights, and with intent to cause injury to Plaintiff.   Plaintiff is therefore entitled to punitive or exemplary damages in an amount appropriate to punish Defendant Flanigan and to deter others from engaging in similar misconduct.

## SECOND CAUSE OF ACTION

### (Interference with Contractual Relations - Against All Defendants)

43.    Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 42 above, as though set forth in full below.

44.    At all relevant times, Defendant Flanigan was aware of valid and existing contracts between Plaintiff, his companies and third parties such as but not limited to Pemex.

45.    Defendant Flanigan intended and believed that his defamatory remarks would damage Plaintiff's contractual relations and coerce Plaintiff into helping Flanigan obtain money.

46.    Defendant Flanigan's actions, as described more fully above, were specifically designed to interfere with Plaintiff's contracts, and entice Pemex, and other companies, to breach their contracts with Plaintiff.

47.    As a result of Defendant Flanigan's actions, at least one company breached its contract with Plaintiff.

48.    As a direct result, Plaintiff has been damaged and will continue to be harmed in an amount to be established at trial.   These damages include, but are not limited to, lost profits, fees, and expenses associated with lost third party contracts.

49.     The conduct of Defendant Flanigan was fraudulent, oppressive and in conscious disregard of Plaintiff's rights.  By reason thereof, Plaintiff is entitled to an award of punitive damages.

## THIRD CAUSE OF ACTION

### (Intentional Interference with Prospective Economic Advantage - Against All Defendants)

50.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 49 above, as though set forth in full below.

51.     By reason of his position as President and Chief Executive Officer of Servicio Industrial Especializado, S.A. de C.V., and  his substantial good will and personal and business reputation, Plaintiff enjoyed numerous prospective future economic relationships and contracts with various third parties, including but not limited to Pemex.  These future economic relationships would have provided Plaintiff and his companies with substantial revenue and profits.

52.     Defendant Flanigan was aware of these relationships, and the potential economic advantage they would provide Plaintiff.

53.     Defendant Flanigan's actions, as described more fully above, were designed to interfere with these relationships and Plaintiff's future economic advantage

54.     As a result of Defendant Flanigan's actions, these economic relationships did not form, and Plaintiff lost and continues to lose substantial revenue and profit.

55.     As a direct result, Plaintiff has been damaged and will continue to be harmed in an amount to be established at trial.  These damages include, but are not limited to, lost profits, fees, and expenses associated with lost third party contracts and/or other lost economic opportunity.

56.     The conduct of Defendant Flanigan was fraudulent, oppressive and in conscious disregard of Plaintiff's rights.  By reason thereof, Plaintiff is entitled to an award of punitive damages.

## FOURTH CAUSE OF ACTION

### (Negligent Interference with Prospective Economic Advantage - Against All Defendants)

57.     Plaintiff realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 56 above, as though set forth in full below.

58.     By reason of his position as President and Chief Executive Officer of Servicio Industrial Especializado, S.A. de C.V., and  his substantial good will and personal and business reputation, Plaintiff enjoyed numerous prospective future economic relationships and contracts with various third parties, including but not limited to Pemex.  These future economic relationships would have provided Plaintiff and his companies with substantial revenue and profits.

59.     Defendant Flanigan was aware of these relationships, and the potential economic advantage they would provide Plaintiff.

60.     Defendant Flanigan knew or should have known that his actions, as described more fully above, would interfere with these relationships and Plaintiff's future economic advantage.

61.     As a result of Defendant Flanigan's actions, these economic relationships did not form, and Plaintiff lost and will continue to lose substantial revenue and profit.

62.     As a direct result, Plaintiff has been damaged and will continue to be harmed in an amount to be established at trial.  These damages include, but are not limited to, lost profits, fees, and expenses associated with lost third party contracts and/or other lost economic opportunity.

## **PRAYER FOR RELIEF**

1.  For compensatory damages in an amount according to proof but within the jurisdiction of this Court;

2.  For prejudgment interest at the maximum legal rate on all sums awarded;

3.  For punitive / exemplary damages in an amount to be ascertained at trial;

4.  For costs of suit and other reasonable expenses; and,

5.  For such other and further relief as this Court deems just and proper.


DATED: July 28, 2005

SMITH, SOVIK, KENDRICK & SUGNET, P.C.

By: _____

Jennifer L. Ploetz, Esq.
Bar Roll No. JP6957
Attorneys for Defendant Jose Ramiro Garza Cantu
250 South Clinton Street, Suite 600
Syracuse, New York 13202
Telephone: 315.474.2911
Facsimile: 315.474.6015

# proceso

# LA MAFIA DE PEMEX

## EL CHAPO
## EL NARCO DEL SEXENIO

## INEPTITUD EN EL ESTADO MAYOR PRESIDENCIAL



SEMANARIO DE INFORMACIÓN Y ANÁLISIS No.1476 • 13 DE FEBRERO DE 2005 • MÉXICO $30/USD $4

7 52435 51380 7
13-03-05

# El narco penetró en Pemex

Antonio Jáquez / Foto: Fernando Gutiérrez Juárez





El empresario estadunidense Bill Flanigan, quien desde 1986 mantiene un pleito legal con el sindicato de Pemex por una suma que llega a los 43 millones de dólares, presentó el mes pasado en Nueva York una nueva demanda apoyada con evidencias de que la empresa paraestatal y el STPRM se convirtieron, a partir del salinismo, en "lavaderos de contratos y dinero" del narcotráfico, específicamente del cártel del Golfo. Y aseguró que, si no llega a un acuerdo con su contraparte, presentará a la corte reveladores documentos de la Secretaría de la Defensa Nacional e informes del archivo secreto del asesinado comandante de la PGR Guillermo González Calderoni...

**S**egún documentos presentados recientemente en una corte de Nueva York, el narcotráfico penetró a Petróleos Mexicanos a través de operadores ligados al sindicato y a la paraestatal, quienes aprovechan el caudal de recursos que maneja la empresa más importante del país para lavar fondos e incluso para financiar campañas políticas, como la de Francisco Labastida Ochoa.

El expediente judicial se centra en la disputa por los 43 millones de dólares del sindicato petrolero congelados en Nueva York desde 2002, en el marco de la demanda de Bill Flanigan, dueño de la empresa Arriba Limited, contra Pemex y dirigentes sindicales, por incumplimiento de un contrato, y de la investigación por el presunto desvío de recursos públicos a la campaña presidencial de Francisco Labastida en 2000, el llamado *Pemexgate*.

Pero los documentos presentados ante la corte, muchos de ellos basados en informes oficiales —por ejemplo, de la Secretaría de la Defensa Nacional—, van más lejos y refieren otras historias sobre la enorme corrupción que campea en Pemex y el sindicato petrolero, organismos tan interdependientes que "son lo mismo", afirma el demandante.

En la demanda de Flanigan se acusa insistentemente al contratista tamaulipeco ▶



Flanigan. Revelaciones

Ramiro Garza Cantú de fungir como agente de Pemex y del sindicato en operaciones turbias, entre ellas la negociación de contratos con altos funcionarios y el enlace con supuestos miembros del cártel del Golfo, como José Cruz Contreras y Alfonso Pérez Vázquez, antiguos personeros de Joaquín Hernández Galicia, *La Quina*.

El jaloneo judicial por los 43 millones de dólares, según el propio Flanigan, es apenas un episodio de la batalla interna por el control de Pemex, que se agudiza en torno de la privatización y de quién será el próximo presidente de México. "Eso es lo que está en juego".

### Residuos

Beneficiario de jugosas concesiones, el sindicato petrolero operaba —y lo sigue haciendo— como una rama de Pemex, con amplias facultades de negociación. Fue así como, en 1984, el sindicato suscribió un contrato con Arriba Limited, por el cual se comprometía a venderle petróleo residual recuperado del proceso de limpieza de las refinerías de Pemex. Pero el negocio se vino abajo cuando el gobierno de Miguel de la Madrid suprimió esa concesión sindical. Entonces, en 1986, Flanigan inició su pleito legal contra el sindicato petrolero.

El empresario entabló una serie de demandas en diversas cortes de Estados Unidos. La mayoría de ellas, ante la Corte de Distrito de Houston, le resultaron favorables. Sin embargo, el sindicato ha incum-

plido las resoluciones judiciales y, hasta hoy, la deuda y los intereses correspondientes ascienden a casi 500 millones de dólares. Entre tanto, Flanigan consiguió el embargo de algunos bienes del sindicato en Estados Unidos y el apoyo obvio de agencias de ambos países que le aportan información para su causa.

Con el *Pemexgate*, que estalló a principios de 2002, a Flanigan le llegó gasolina para la hoguera judicial. Tan pronto supo que las autoridades mexicanas descubrieron una cuenta bancaria del sindicato petrolero en Nueva York, que supuestamente estaba destinada a cubrir el adeudo con Arriba Limited, Flanigan se movilizó para congelar los fondos y lo consiguió en noviembre de ese año. El caso se enredó más cuando el gobierno mexicano reclamó la repatriación de los fondos. Más de dos años después, el juicio sigue estancado.

Resuelto a dar el empujón definitivo, Flanigan presentó una nueva demanda, el 11 de enero pasado, en la Corte de Distrito de Brooklyn, con una lista de acusados que encabezan Petróleos Mexicanos y el Sindicato de Trabajadores Petroleros de la República Mexicana (STPRM), con todo y su líder Carlos Romero Deschamps y sus exdirigentes Joaquín Hernández Galicia y José Cruz Contreras.

### Lavado

El capítulo de "Alegatos" de la demanda incluye datos como los siguientes:

—Pemex y el sindicato están anudados indisolublemente. A lo largo de su historia, uno sirve como agente del otro. Esta tradición se cumplió más o menos en paz hasta el sexenio de Carlos Salinas de Gortari.

—El narcotráfico empezó a invadir el sistema como una manera de lavar sus ganancias ilícitas. Pocos negocios en México eran suficientemente grandes para ofrecer el flujo de dinero encubierto como el aportado por Pemex.

Flanigan: "Pocos negocios podrían haber sido infiltrados por narcotraficantes tan fácilmente como cuando *los hermanos*, junto con Alejandro Rodríguez S., controlaron a la arrogante burocracia de Pemex".

En un reportaje publicado en mayo de 1993 (**Proceso** 863), Rodríguez fue identificado como director de la empresa Asesoría Plus. Solía afirmar que "era amigo personal, desde la infancia, del presidente Carlos Salinas" y, en sus gestiones por el problema con Arriba Limited, se decía "representante personal del presidente"; además, se ostentó como *socio silencioso* de Raúl Salinas de Gortari...

—En octubre (de 2004), el director de Pemex, Raúl Muñoz Leos, fue forzado a renunciar, según se dijo, bajo amenaza de escándalo por pagarle una cirugía estética a su esposa. "Pero la verdadera razón fueron los 700 millones de dólares dados al sindicato".

—Según admiten en el convenio administrativo 9442, el sindicato y Pemex acordaron un préstamo contingente por "mil 400 millones de dólares" (en realidad son pesos) para cubrir la deuda con Arriba Limited.

—Durante la elección presidencial de 2000, Pemex le prestó al sindicato 125 millones de dólares, parte de los cuales estaban destinados a pagarle a Flanigan.

En otro punto de su demanda, Flanigan cuenta que Leonardo Rodríguez Alcaine jugó un papel en esta historia. En septiembre de 2000, el secretario general de la Confederación de Trabajadores de México (CTM) envió a Houston al abogado Ríos Martínez para que se reuniera con Flanigan y negociara un acuerdo que finiquitara la disputa con Arriba. Flanigan le preguntó qué tanto le habían autorizado a pagar. Ríos Martínez le dijo que 4 millones de dólares. Riéndose, Flanigan le respondió que con ese dinero no pagaría ni a sus abogados, que había que volver a la suma determinada en el juicio de 1986, más los intereses acumulados (para entonces, unos 220 millones de dólares).

Ríos Martínez señaló que eso era demasiado y le contó que un abogado apellidado Pikoff le ofreció arreglar todas las demandas de Arriba por 250 mil dólares y un soborno de 25 mil dólares a un funcio-

nario de Pemex. No aceptaron el trato porque, según el propio Ríos Martínez, se dieron cuenta de que era un fraude. Antes de regresar a México, Ríos Martínez le dejó a Flanigan como regalo la correspondencia de Pikoff, que forma parte del paquete de evidencias de la demanda que se ventila en Nueva York.

El 5 de diciembre de 2000, Flanigan fue contactado por un oficial militar del gobierno de Ernesto Zedillo, supuestamente miembro de un grupo de inteligencia seleccionado por el presidente saliente para acabar con la corrupción. Días después, se reunió en Puebla con un grupo ligado a la demanda, pero no prosperó ningún acuerdo.

## El cártel de Pemex

En su demanda, Flanigan traza la ficha de cada uno de los acusados. Por ejemplo:

**José Cruz Contreras** era socio de *La Quina* y una de las piezas clave de la Comisión de Contratos, el área sindical más favorecida por Pemex. Se exilió en McAllen, Texas, tras el arresto de *La Quina*, en enero de 1989, y desde ahí malversó recursos y sobornó funcionarios para que no arrestaran a su cómplice Victorino López Reyes. "Posee o controla aeronaves que están al servicio del cártel del Golfo, lo que le deja grandes ganancias ilegales que lo han enriquecido. Lo llaman *El Padrino*".

**Ramiro Garza Cantú** "es la fachada de corruptos funcionarios gubernamentales y de Pemex que son sobornados para arreglar contratos licitados. En estos grandes contratos de construcción participan compañías como Brown & Root, Halliburton y Dannenbaum Engineering, en proyectos como el Corredor Trans Texas, el Distrito de Navegación de Brownville, los puentes fronterizos Texas-México y en otros proyectos que requieren fondos públicos procedentes de impuestos".

Por medio de estos grandes contratos "y de sus nexos con funcionarios de Arabia Saudita, Paquistán, México e Irak, junto con miembros del cártel del Golfo, Garza Cantú ha sido un operador en el lavado de sumas importantes de dinero". Empleando al exabogado de Arriba Limited como asesor, David B. Black, Garza Cantú "ha interferido en la relación contractual del demandante con el sindicato".

Los contratos internacionales ganados por Garza Cantú, como el Corredor Trans Texas, le han permitido desarrollar "muchas conexiones políticas en ambos lados de la frontera". En 1999, un consorcio del que formaba parte la compañía de Garza Cantú, llamada Corporación Mexicana de Mantenimiento Integral, ganó cuatro con-

tratos ligados al Proyecto Cantarell, por mil 500 millones de dólares.

La víspera, dice Flanigan, Garza Cantú "estuvo presente" en una reunión "en la casa de descanso de Ernesto Zedillo en Mexicali, en la que le ofrecieron al presidente un soborno por 30 millones de dólares por garantizar la asignación de los contratos" de Cantarell.

Garza Cantú se relacionó con Sadam Hussein en el sexenio de Salinas. Cuando Irak fue sancionado por Estados Unidos y la ONU, en la Primera Guerra del Golfo, Garza Cantú se reunió con Hussein para negociar la compra de crudo iraquí a 7.41 dólares el barril, cuando el precio de mercado era de 18.90 dólares. "Estas compras continuaron hasta 2003. Este petróleo fue mezclado con el que estaba pactado para Arriba Limited —por el contrato de 1984 con el sindicato—, y embarcado a las refinerías de la costa del Golfo".

Además "del petróleo robado al demandante, Garza Cantú, con la ayuda de funcionarios corruptos de Pemex, ha contrabandeado crudo mexicano y lo ha vendido a refinerías estadunidenses. A través de estas actividades deshonestas, Raimiro Garza Cantú se ha convertido en uno de los hombres más ricos del mundo".

**Carlos Romero Deschamps** es el líder actual del sindicato petrolero. "Ha sido acusado varias veces en México, pero su fuero como senador ha evitado que se le enjuicie. El día que se congelaron los fondos en Nueva York, Romero intentó so-

bornar al banco para que transfiriera el dinero a su cuenta personal. Romero sigue instrucciones de Garza Cantú, y como pieza clave en el escándalo del *Pemexgate* ha violado leyes bancarias de México y Estados Unidos a través del lavado de grandes cantidades de dinero. Cuando se le preguntó por el origen de estos fondos, él mintió a autoridades judiciales y a otras autoridades federales al decir que su esposa ganó el dinero en la lotería mexicana".

Flanigan: "Romero Deschamps ha sobornado a tantos jueces en México que su soberbia excede la arrogancia de Napoleón".

Del exsenador **Jaime Morelos Canseco** se afirma lo siguiente:

"Es el abogado del grupo demandado. Es la fachada y el conducto a través del cual se pagan los sobornos a funcionarios de Pemex. Es bilingüe y es el negociador principal en los grandes contratos internacionales. Es socio del cártel del Golfo y del clan de Garza Cantú. Es testigo material de todos los hechos descritos en la demanda y tiene conocimiento personal de los cargos", además de que él mismo ha incurrido en delitos para continuar el fraude de contra el demandante.

**Noé Manuel Moreno Álvarez**, "alias *Noé Álvarez Hernández*", es un asesor de todas las confianzas de *La Quina*. "Es un criminal conocido en México; uno de sus negocios es el tráfico de migrantes desde el estado de Tabasco a Canadá. Posee una gran riqueza que le permite financiar a políticos en todo México a cambio de contra- ▶



La Quina y José Cruz. "Lavado"

tos estatales y federales que son útiles para el lavado de dinero".

Moreno Álvarez, según una investigación que se sigue en McAllen, es socio de Garza Cantú y de "otros miembros del crimen organizado vinculados al cártel del Golfo".

**Alfonso Pérez Vázquez**, *El Yuca*, "es un criminal conocido en México que ha sido implicado en dos asesinatos por contrato. Es el jefe de una banda de ladrones de autos que opera entre México y Estados Unidos. Coludido con funcionarios corruptos de Pemex y el sindicato y otros empleados del gobierno, pagó sobornos por contratos fraudulentos y desvió fondos públicos en beneficio propio".

Hay información, asegura Flanigan, de que Pérez Vázquez "posee y negocia armas ilegales reservadas para uso militar que son compradas y usadas por grupos terroristas. Se sabe también que está involucrado directamente en el narcotráfico y el lavado de dinero. Fue y es un empleado del cártel del Golfo. En el caso de Arriba Limited, ha sido un operador de Cruz Contreras, actuando como abogado *de facto* ante las cortes de modo fraudulento".



**¡Vecino de la delegación Tláhuac!**

**Adquiera su suscripción anual y reciba 6 ejemplares adicionales**

**Mayor información al 5636.2080**
suscripciones@proceso.com.mx

**Promoción válida
hasta el 18 de marzo del 2005**

Se aplican restricciones por zonas de reparto

Desde octubre de 1994, **Proceso** (936) ubicó a Pérez Vázquez, con base en el testimonio del periodista Adalberto Garza: *El Yuca*, dijo, además de controlar a los porros de la Universidad Autónoma de Tamaulipas desde la Dirección de Relaciones Públicas, ha sido el enlace con los narcos por medio de su suegro José Cruz Contreras y bajo la protección de un hijo del general Juan Arévalo Gardoqui.; "tuvo su mejor época en el gobierno de Emilio Martínez Manautou, quien entregó todas las posiciones del aparato judicial a gente de Pérez Vázquez, que hicieron horrores con absoluta impunidad", contó Garza al reportero.

## Informes secretos

Flanigan formula en su demanda 11 cargos. Uno de ellos señala que Pemex y el sindicato ha sido organizado por Pemex como un mero canal empresarial para lavar contratos y dinero". En otro cargo, se afirma que la separación de Pemex y el sindicato es una ficción que se ha usado para cometer fraude contra los mexicanos y los inversionistas internacionales.

Otro de los cargos resume los nexos entre los acusados: "El sindicato actúa como el agente de Pemex. Pemex actúa como el agente del sindicato. Ramiro Garza Cantú actúa como el agente del sindicato y Pemex. Cada uno de los acusados actúa como agente de los otros". Un ejemplo de estos actos es que Garza Cantú "ha transferido y ocultado activos del sindicato y ha usado las utilidades del sindicato para lavar dinero y adquirir otras propiedades que realmente le pertenecen al demandante".

Entre las evidencias aportadas por Flanigan se encuentra una escritura que da fe de las declaraciones de "don Carlos Romero Deschamps, don Fernando Pacheco Martínez y don Luis Ricardo Aldana Prieto", rendidas ante el notario público Juan José del Valle Alvarado, en Tepeji del Río de Ocampo, Hidalgo.

El testimonio, fechado el 1 de agosto de 2002, dice:

Romero Deschamps "abrió una cuenta a nombre y de parte del Sindicato de Trabajadores Petroleros de la República Mexicana en Estados Unidos, en Pershing, una división de Donaldson, Lufkin & Jenrette Securities Corporation... y esta cuenta todavía existe e indica que cualquiera de los declarantes tiene la autoridad sobre la cuenta en nombre del sindicato".



Romero. "Lotería"

Establece, además, que cada uno de los declarantes "está de acuerdo en que los fondos que se tienen en la cuenta deben ser transferidos a México y a la cuenta del sindicato 55901859-7 en el Banco Mercantil del Norte, sociedad anónima, institución de banca múltiple, Grupo Financiero Banorte, donde dicha cuenta está sujeta a la supervisión del gobierno mexicano en el momento de la transferencia...".

En principio, el juez Robert Levy autorizó la repatriación de los fondos, a solicitud del gobierno mexicano y con la anuencia de los citados personajes, según el documento, en el que, por cierto, se relata el flujo del dinero:

Resulta que, el 19 de octubre de 2000, 390 millones de pesos salidos de Pemex se depositaron en la cuenta del sindicato en Banorte. El mismo día, el tesorero del sindicato, el senador Luis Ricardo Aldana, instruyó a un ejecutivo de Banorte, de nombre Amira Alonso, para que convirtiera esos 390 millones de pesos a dólares y los transfiriera al citado banco de Nueva York. Los 39 millones de dólares resultantes del tipo de cambio se convirtieron en alrededor de 43 millones, con los intereses acumulados. Es el dinero que está aún en disputa y que no se puede repatriar por el embargo conseguido por Flanigan.

La primera audiencia por la nueva demanda, en la Corte de Distrito Este de Nueva York, se celebrará tentativamente el próximo 28 de febrero, aunque es probable que se difiera dos semanas, según averiguó el corresponsal Jesús Esquivel.

Flanigan, sin embargo, prefiere llegar a un acuerdo extrajudicial que evite arribar a la corte. En caso de que no haya convenio, está listo para presentar en la corte centenares de documentos que sustentan sus acusaciones, entre ellos reportes de la Sedena e informes del archivo secreto de Guillermo González Calderoni, el comandante de la PGR salinista que fue ejecutado en McAllen. ⊙