UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X

JOSE RAMIRO GARZA CANTU,

       Plaintiff,             <u>MEMORANDUM AND ORDER</u>

   v.                         Civil Action No.
                               CV-05-3580 (DGT)(RLM)

BILLY R. FLANIGAN, UNKNOWN /
UNNAMED DEFENDANT, and DOES 1
Through 10, inclusive,

       Defendants.

-------------------------------X

Trager, J:

    Plaintiff Jose Ramiro Garza Cantu ("Cantu") brought this action against defendant Billy R. Flanigan ("Flanigan"), alleging that Flanigan had defamed Cantu.  A jury agreed, awarding Cantu $38,000,000 in economic damages and $150,000,000 in non-economic damages.  On appeal, the Second Circuit Court of Appeals upheld the $38,000,000 award for economic damages, but remanded the case for an explanation as to why the non-economic damages award was not excessive.  For the reasons stated below, the jury's award for non-economic damages is upheld.

**Background**

    The following facts emerged at trial.  Cantu is a businessman who lives in Mexico City, Mexico.  Trial Transcript

1

("Tr.") 282.  He works in the petroleum industry, and has produced testimony indicating that he has worked hard to build a world-wide reputation within that industry as a man of integrity.  Tr. 217-18, 221, 228, 243.

Cantu began to build his reputation within the industry at an early age.  After completing his college education, Cantu purchased a dump truck and started a business selling gravel and sand to refineries.  Tr. 275.  As the business expanded, Cantu's reputation became more widely known within Mexico.  Tr. 275-80. Several years later, an engineer named Hector Lara Sosa ("Hector") approached Cantu with an offer to run a large refinery in the city of Tampico.  Tr. 278.  The refinery had previously been shut down by the Mexican government due to allegations of corruption among the engineers and contractors, and Hector sought a man with a reputation such as Cantu's to lead the operation.  Tr. 278-81.  Despite Cantu's relative lack of experience, Hector vouched for Cantu, and his appointment was approved.  Tr. 280.  Soon, Cantu was managing as many as 6,000 employees.  Tr. 281.

After working in Tampico for ten years, Cantu began a new business serving other regions of Mexico.  Tr. 281-82.  Cantu's new business began by selling gravel and sand, as well as building refineries.  Tr. 282.  Soon, however, it expanded into

on-shore and off-shore drilling, as well as the keeping and maintaining of several ships.  Id.  This required Cantu to create several separate companies, each designed to perform different types of work.  Id.  Although Cantu has since conveyed some of the stock interest in these companies to his family members, he has retained the power to absolutely control their activities.  Tr. 282-83.

Flanigan is a businessman who served as President of a Bahamian corporation named Arriba, Ltd.  Arriba, Ltd. v. Petroleos Mexicanos, 962 F.2d 528, 530 (5th Cir. 1992); Comm'n of Contracts of the Gen. Executive Comm. of the Petroleum Workers Union of the Republic of Mex. v. Arriba, Ltd., 882 S.W.2d 576, 580 (Tex. App. 1994).  Over the past two decades, Flanigan has been involved in multiple lawsuits against a Mexican petroleum workers union, among others, and has claimed that he is entitled to collect a default judgment of $800,000,000 against the union.  Tr. 101.  The parties here have stipulated that Flanigan's corporation once obtained a default judgment against such third parties in 1986.  Tr. 71, 73-74, 173.  However, as this court has previously noted, "it appears that Flanigan has been stymied in his quest to collect on the default judgment by assertions of foreign sovereign immunity, among other defenses."  Cantu v. Flanigan, 05-CV-3580, 2007 WL

3

2480119, at *4 (E.D.N.Y. August 27, 2007) ("Cantu I") (internal
citations omitted). Significantly, an appellate court in Texas
has already ruled that the 1986 default judgment against the
union was invalid because the union did not have notice of the
lawsuit. Comm'n of Contracts, 882 S.W.2d at 587. Therefore,
"it is not at all clear that the 1986 Judgment is enforceable."
Cantu I, 2007 WL 2480119, at *4.

Despite never having met Cantu, Flanigan believed that
Cantu "ha[d] connections with the Mexican government" and "could
assist in the settlement of the judgment" that Flanigan had
previously attempted to collect from the petroleum workers
union. Tr. 104. Therefore, Flanigan engaged in a course of
conduct designed to pressure Cantu into either paying Flanigan
the amount of the default judgment, or using his position and
influence to help Flanigan collect from the union. Tr. 174,
175, 182.

Flanigan began by drafting a document on his personal
computer that he titled "amicus brief." Tr. 82. Despite its
title, this document was made to resemble a legal complaint,
listing Cantu as a defendant and declaring that Flanigan sought

monetary damages.[1]  Id.  The "amicus brief" stated that Cantu was the operations manager of a racketeering enterprise, and that he had laundered large sums of money.  Tr. 85-86.  It further alleged that Cantu had participated in the bribery of government officials who awarded "rigged bid contracts," and that Cantu was personally present when Mexican President Zedillo was awarded a $350 million bribe.  Tr. 85, 88.  The "amicus brief" continued by alleging that Cantu was involved in drug cartels, that he headed the "Ramiro Garza crime family," that he illegally smuggled oil into the United States, that he had conspired with Iraqi President Saddam Hussein to illegally circumvent sanctions against Iraq and that he was personally responsible for causing the price of gasoline to rise.  Tr. 86-91.  Flanigan ultimately accused Cantu of having committed mail fraud, wire fraud, tampering, obstruction of commerce, unlawful travel, theft by conversion and extortion.  Tr. 91.

    After drafting the "amicus brief" containing these allegations, Flanigan met with Antonio Jaquez ("Jaquez"), a reporter from the popular and widely-circulated Mexican magazine Processo.  Id.  On December 23, 2004, the two men met and, for several hours, discussed the allegations contained in the

---

[1] Despite the fact that this document was made to resemble a complaint seeking monetary damages, no such suit was ever filed by Flanigan against Cantu.  Tr. 83.

"amicus brief" Flanigan had drafted.  Tr. 94-95.  Flanigan also informed Jaquez that he could acquire more information on these allegations by seeking out documents filed in the Eastern District of New York.[2]  Tr. 119-20.

On January 10, 2005, Flanigan sent a copy of his "amicus brief" to the Eastern District of New York.  Cantu I, 2007 WL 2480119, at *1.  Flanigan apparently desired to have this document become part of the public record in a separate case,[3] despite the fact that he was not a party to the action and had not received permission from the court to file such a document. Id.  Because Flanigan never received permission from the court to file such a document, the "amicus brief" never became part of the record.  Id.  Nonetheless, it was publicly accessible on the electronic database PACER, where it could be obtained by Jaquez. Tr. 84-85.

On February 13, 2005, Jaquez printed an article in Processo (the "Processo article") about Cantu.  The story was featured on the front cover, and it repeated Flanigan's allegations against

---

[2] The only document filed in the Eastern District relating to this case was the "amicus brief" itself, which Flanigan himself would submit to the court on January 10, 2005.  Tr. 119-20.  Flanigan later moved for summary judgment, arguing that the allegations he made against Cantu were judicially privileged because they were filed in court.  Cantu I, 2007 WL 2480119, at *7.  However, Flanigan's motion was denied.  Id.

[3] In re: All Funds in Account 6MH215309, M-02-906 (RML) (E.D.N.Y. 2005).

Cantu.  Tr. 116, Pl. Ex. D.  At times, the Processo article quoted Flanigan's "amicus brief" verbatim.  Id.  According to the Processo article, Cantu had "become one of the richest men in the world" due to the various illegal activities discussed in Flanigan's "amicus brief."  Id.

Due to the wide circulation of Processo magazine, Flanigan's accusations were distributed throughout the world.  A Greek businessman named Panaretos Lagos Georgala ("Georgala") learned of the allegations contained in the Processo article and immediately cancelled a multi-million dollar contract for the purchase of several vessels from Cantu's companies.  Pl. Ex. E at 22-26.  The cancelled contract for the vessels was valued at $289,950,000, resulting in a personal loss to Cantu himself of roughly $35,000,000.[4]  Tr. at 342; Pl. Ex. E at 19.  According to Georgala, the contract had to be cancelled in order to preserve the reputation of his own company, Discoverer ASA, Ltd.  Pl. Ex. E at 7, 25.  Given the serious and widespread nature of the allegations against Cantu, Georgala did not wish for his company to be associated with Cantu's.  Id. at 25.

---

[4] Cantu introduced expert testimony from economist Frank Tinari, who calculated Cantu's personal loss by examining the percentage of these companies that Cantu owned at the time of the loss. Tr. at 331-42.

Cantu also introduced evidence that the damage to his reputation had resulted in an inability to secure other multi-million dollar contracts.  Four months after the Processo article published Flanigan's accusations, one of Cantu's companies began to lose contracting bids.  Tr. 247-48. Specifically, a business owned by Cantu named Grupo R had attempted to secure a $69,000,000 contract with a company named Petroleos Mexicanos for the lease of drilling equipment.  Id. Despite having submitted the lowest bid, Grupo R was not awarded the contract.  Tr. 247.  The loss of this $69,000,000 contract represented a personal loss to Cantu of approximately $9,860,000.  Tr. 346.

In addition to affecting Cantu's personal and business relationships, the Processo article also prompted criminal investigations by the Mexican government and the United States Department of Justice.  Tr. 286, 293-94.  According to Mexican prosecutor Francisco Penaloza ("Penaloza"), the Processo article constituted a "criminal notice" that compelled a criminal investigation.  Tr. 130.  However, Penaloza ultimately found that Cantu "ha[d] no relation with organized crime whatsoever," and that there was no evidence to support the accusations of oil smuggling, bribery or money laundering.  Tr. at 131-32.

8

Similarly, the United States Department of Justice investigated
Cantu and found "no evidence of criminal activity."  Tr. 135.

In April 2005, Joaquin Legarreta ("Legarreta"), a
consultant employed by Cantu, met with Flanigan in Houston,
Texas, to request that he publicly retract the statements he had
been making about Cantu.  Tr. 160, 173.  In response, Flanigan
mentioned that a Mexican union owed him a substantial amount of
money, and that he wanted Cantu to either pay this amount or use
his contacts within Mexico to pressure the union to do so.
Tr. 174.  When Legarreta accused Flanigan of extortion and
defamation, Flanigan responded that he did not care whether the
statements were true or not, and that he just wanted his money.
Tr. 175, 182.

On July 29, 2005, Cantu filed the complaint in this action
against Flanigan, alleging defamation and seeking economic
damages to compensate for his lost contracts, as well as non-
economic damages to compensate for the harm to his reputation
and the humiliation and mental anguish caused by Flanigan.
Cantu declined to seek punitive damages.[5]  Tr. 6, 475.  After the
case proceeded to trial, a jury determined that Flanigan was

---

[5] During deliberations, the jury submitted a note asking whether
non-economic damages included punitive damages.  Tr. 475.  The
question was answered in the negative, and the jurors were
instructed that Cantu did not seek any punitive damages.  Id.

liable for defamation, and awarded Cantu $38,000,000 in economic damages to compensate Cantu for his lost contracts, as well as $150,000,000 in non-economic damages to compensate Cantu for the harm to his reputation and the humiliation and mental anguish caused by Flanigan.  Tr. 476-77.  Flanigan's motion to set aside the jury's award was denied.  Tr. 478-79.  On appeal, the Second Circuit Court of Appeals upheld the $38,000,000 award for economic damages.  Cantu v. Flanigan, 341 Fed. App'x 694, 695-96 (2d Cir. 2009) ("Cantu II").  However, the Second Circuit expressed its concern that no basis was articulated for the refusal to reduce the jury's award of non-economic damages.  Id. at 696.  Therefore, the Second Circuit remanded the case for a more detailed explanation of the basis for the affirmance of the jury's non-economic damages award, so that it could review the decision for abuse of discretion.  Id. ("We by no means exclude the possibility that the District Court acted well within its discretion in affirming a jury verdict of this size; we are simply unable to address the issue on the record before us.").  Pursuant to the Second Circuit's summary order, the parties were given the opportunity to submit further briefs addressing the issue of non-economic damages.[6]  Id.  For the reasons that follow, the jury's award of non-economic damages is affirmed.

_____

[6] On November 19, 2009, after missing his initial deadline for

10

## Discussion

### (1)

### Standard of Review

When assessing the excessiveness of damages in a diversity suit, a federal district court must apply the law of the forum state.  See Imbrogno v. Chamberlin, 89 F.3d 87, 89 (2d Cir. 1996) ("[T]he [federal] trial court should have . . . looked to Connecticut substantive law to determine whether the jury award was excessive.").  Accordingly, this court must apply the law of New York.  Gasperini v. Ctr. For Humanities, Inc., 518 U.S. 415, 438 (1996).

Under N.Y. CPLR § 5501(c), "[i]n reviewing a money judgment . . . in which it is contended that the award is excessive . . . , the appellate division shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation."  Although this sentence, read literally, appears to apply only to the appellate courts of New

_____

responding, as well as an additional extended deadline, defendant filed a document titled "Declaration of Acquiescence for filed: Counteroffer and 'Declaration of Express Trust' for Billy-Robert: Family of Flanigan assigning David-G.: Family of Trager as Trustee."  Rather than addressing the issues raised by the Second Circuit's summary order, defendant's filing accused the parties involved in the lawsuit of various acts of criminal wrongdoing, and asserted that defendant was entitled to $200,000,000.  By separate order, plaintiff's motion to strike is granted.

York, it has been interpreted as applying to state trial courts and federal district courts sitting in diversity as well. Gasperini, 518 U.S. at 425, 438; see also Imbrogno, 89 F.3d at 89.  Therefore, as a federal district court sitting in diversity, this court must determine whether or not the jury's award of non-economic damages "deviates materially from what would be reasonable compensation" under New York law.  N.Y. CPLR § 5501(c); see also Gasperini, 518 U.S. at 438 ("Within the federal system, practical reasons combine with Seventh Amendment constraints to lodge in the [federal] district court, not the court of appeals, primary responsibility for application of § 5501(c)'s 'deviates materially' check.").  If the award is found to be excessive, a reduction in damages may be within this court's discretion.  Cantu II, 341 Fed. App'x at 696; Geraci v. Probst, 61 A.D.3d 717, 719, 877 N.Y.S.2d 386, 389 (2d Dep't 2009) (affirming trial court's decision to grant a new trial to re-assess the amount of damages unless plaintiff agreed to a reduction of the jury's award).

(2)

**The Jury's Award Of Non-Economic
Damages Was Not Excessive**

Under N.Y. CPLR § 5501(c), the determination of whether a
jury's award "deviates materially from what would be reasonable
compensation" is "one of the most difficult decisions required
to be made by a court."  In re Joint Eastern and Southern Dist.
Asbestos Litig., 9 F. Supp. 2d 307, 311 (S.D.N.Y. 1998)
(internal citation omitted).  "The task at hand requires not
only the determination of sufficient compensation to assuage
nonmonetary suffering, but also the identification of the upper
limit beyond which the award cannot go."  Id.  Nonetheless, in
light of prior case law in New York, as well as the multi-
million-dollar contracts that have been lost due to this
particular act of defamation, it cannot be said that the jury's
award of $150,000,000 for non-economic damages is an amount that
"deviates materially from what would be reasonable
compensation."  N.Y. CPLR § 5501(c).

In determining whether an award "deviates materially from
what would be reasonable compensation," a reviewing court must
examine the awards that have been approved in "similar cases."
Gasperini, 518 U.S. at 425.  If the jury's award is within the
range of awards approved by New York courts in "similar cases,"

13

then it may properly be found that the award does not "deviate[] materially from what would be reasonable compensation." See Patterson v. Balsamico, 440 F.3d 104, 120 (2d Cir. 2006).

However, a court reviewing an award under section 5501 cannot simply catalogue the jury awards that have been acceptable in the past to determine whether the award under review is excessive. Indeed, "no two cases are exactly the same." Okraynets v. Metro. Transp. Auth., 555 F. Supp. 2d 420, 438 (S.D.N.Y. 2008). New factual scenarios may arise that warrant larger awards than those approved in prior cases. See So v. Wing Tat Realty, Inc., 259 A.D.2d 373, 374, 687 N.Y.S.2d 99, 101 (1st Dep't 1999) ("Modification of damages, which is a speculative endeavor, cannot be based upon case precedent alone, because comparison of injuries in different cases is virtually impossible."). Therefore, "the standard under § 5501(c) is not whether an award deviates at all from past awards - it is whether an award deviates materially from reasonable compensation." Okraynets, 555 F. Supp. 2d at 439; see also Asbestos Litig., 9 F. Supp. 2d at 311 ("Prior awards . . . are regarded by the New York appellate courts performing § 5501(c) review as not binding but instructive.").

In assessing the amount of damages to award for defamation, a jury is not limited to compensating the plaintiff for

14

"economic" losses, such as demonstrable lost profits. See Gertz
v. Robert Welch, Inc., 418 U.S. 323, 350 (1974). Rather, a
plaintiff may suffer "non-economic" injuries as well. Among
these is the loss of reputation, which includes the loss of
professional status and the ability to earn wages, as well as
any humiliation or mental suffering caused by the defamation.
See Mattox v. News Syndicate Co., 176 F.2d 897, 901-02 (2d Cir.
1949) ("[I]t is universally agreed that the damages recoverable
in libel are the plaintiff's loss of reputation in the minds of
those who know him or know about him, together with this mental
suffering as a result of the libel."); see also Lundell Mfg. Co.
v. Am. Broad. Co., 98 F.3d 351, 364-65 (8th Cir. 1996)
(upholding an award of $900,000 for damage to reputation — in
addition to a separate award of $158,000 for past and future
lost profits — where defendant's act of defamation impaired
plaintiff's ability to sell a recycling machine); Resolution
Trust Corp. v. Miramon, 935 F. Supp. 838, 844 (E.D. La. 1996)
("Damages for loss of reputation seek to make one whole for loss
of the ability to earn wages, borrow money, and to enjoy life as
fully as before the injury."); Prozeralik v. Capital Cities
Commc'ns, Inc., 222 A.D.2d 1020, 1021, 635 N.Y.S.2d 913, 914
(4th Dep't 1995) ("Prozeralik IV") (upholding an award of
$6,000,000 for injury to plaintiff's reputation and $3,500,000

15

for mental suffering – in addition to a separate award of
$1,500,000 for direct financial loss – where defendant's act of
defamation injured the reputation of prominent local
restaurateur), lv. denied, 88 N.Y.2d 812, 672 N.E.2d 605,
649 N.Y.S.2d 379 (1996) (Table).  In this case, the Second
Circuit has upheld the award of $38,000,000 for "economic"
injuries.  Cantu II, 341 Fed. App'x at 695-96.  However, it
remains to be decided whether the additional award of
$150,000,000 for "non-economic" injuries was appropriate.

Due to the uncertainties in calculating such damage awards,
New York courts have consistently held that deference to the
jury's findings is required in considering whether to reduce a
jury's award.  See, e.g., Calhoun v. Cooper, 206 A.D.2d 497,
497, 614 N.Y.S.2d 762, 762 (2d Dep't 1994) ("It is settled that
the amount of damages to be awarded in a defamation action is
peculiarly within the jury's province, and that . . . the
discretion of a . . . court over damage awards should be
exercised sparingly.") (internal citations omitted).  Jurors are
uniquely positioned to assess the evidence presented at trial
and assign a monetary value to the plaintiff's non-economic
damages.  Therefore, although this court cannot avoid its duty
to conduct section 5501(c) review of the jury's verdict, the

discretion to reduce such an award should be "exercised sparingly" under New York law.  Id.

In calculating non-economic damages in a defamation case, including humiliation, mental suffering and damage to plaintiff's reputation, a jury may properly consider a number of factors.  In this case, the jury was instructed to consider: "[1] the plaintiff's standing in the community, [2] the nature of defendant's statements made about the plaintiff, [3] the extent to which the statements were circulated, [4] the tendency of the statement to injure a person such as the plaintiff, and [5] all of the other facts and circumstances in the case." Pl. Ex. A at 20 (jury charge); Tr. 466 (same); see also N.Y. Pattern Jury Instr. Civil 3:29 (gathering cases); Crane v. N.Y. World Telegram Corp., 308 N.Y. 470, 476 (1955); Bishop v. New York Times Co., 233 N.Y. 446, 460 (1922) ("[A] plaintiff may . . . show the nature of his business . . . as bearing upon the hurtful tendency of the libel."); Morsette v. The Final Call, 309 A.D.2d 249, 257, 764 N.Y.S.2d 416, 422 (1st Dep't 2003) (considering "plaintiff's education and professional attainment" in evaluating the appropriate amount of damages for "harm to reputation"); Robert D. Sack, Sack on Defamation: Libel, Slander, and Related Problems § 10.5.1 (2008) (discussing factors a jury may consider when awarding damages for harm to

reputation).  Additionally, the jury may consider all future harm to the plaintiff's reputation, as well as any humiliation or mental anguish that plaintiff would suffer in the future. See Calhoun, 206 A.D.2d at 497, 614 N.Y.S.2d at 762 (reversing trial court's decision and reinstating jury's award for "future compensatory damages" in a defamation case).

Upon examination of the substantial evidence in front of the jury with respect to each of these factors, it cannot be said that the jury's award is excessive under New York law. With respect to the first factor, plaintiff's standing in the community, the uncontradicted evidence at trial established that Cantu had a positive reputation throughout the petroleum industry and that his reputation for honesty and fair business practice was recognized throughout the world by his peers. Cantu owned and controlled several Mexican corporations, which he had acquired due in part to his positive reputation within the industry.  The evidence also indicated that Cantu's reputation enabled him to secure large, multi-million dollar contracts.  Therefore, this first factor weighs heavily in favor of finding a large award.

With respect to the second factor, the nature of the defendant's statements made about the plaintiff, the defendant's statements were indeed inflammatory.  According to Flanigan,

18

Cantu had laundered large sums of money, operated a racketeering enterprise, headed a "crime family," bribed the President of Mexico, illegally smuggled oil into the United States, caused the price of gasoline to rise and conspired with Iraqi President Saddam Hussein to circumvent United States and United Nations sanctions.  In addition, Flanigan alleged that Cantu had committed other crimes, including mail fraud, wire fraud, tampering, obstruction of commerce, unlawful travel and theft by extortion.  All of these statements were directed at plaintiff's hard-earned reputation within the business community. Therefore, this second factor also weighs heavily in favor of finding a large award.

With respect to the third factor, the extent to which the statements were circulated, the statements at issue here were circulated throughout the world, and most especially in Mexico, plaintiff's home.  Therefore, this third factor also weighs heavily in favor of finding a large award.

With respect to the fourth factor, the tendency of the statement to injure a person such as the plaintiff, these remarks certainly tended to damage Cantu's reputation and cause mental suffering.  The remarks at issue addressed Cantu's professional reputation within the petroleum industry — essentially accusing Cantu of corrupt and fraudulent business

19

practices — and were made such that they would appear to be coming from a credible source (i.e., first a court document and then a magazine with world-wide circulation). Additionally, Cantu depended upon his reputation to secure large, multi-million dollar contracts, and stood to lose the ability to secure such contracts if his reputation were tarnished. The record indicates that such contracts were quickly lost when Cantu came under a cloud of suspicion for corrupt and fraudulent business practices. In fact, the record reveals that Georgala rescinded a contract valued at $289,950,000 due to the defamation, and that Petroleos Mexicanos declined to enter into a contract valued at $69,000,000 due to the defamation. This indicates that the statements were particularly damaging to Cantu. Therefore, this fourth factor also weighs heavily in favor of finding a large award.

Finally, and perhaps most significantly, it must be noted that Flanigan's conduct was more than merely reckless. He engaged in a deliberate course of conduct that can only be described as attempted criminal extortion. See N.Y. Penal Law § 110.00; N.Y. Penal Law § 155.05(2)(e). In addition to making these damaging accusations against Cantu's professional reputation, Flanigan sought to use these comments as leverage to pressure Cantu into either paying Flanigan hundreds of millions

20

of dollars or compelling a Mexican union to do so.  While plaintiff did not seek punitive damages, this conduct served to enhance the mental suffering that Cantu experienced due to the defamatory statements, and must also be considered in calculating the reasonableness of the jury's non-economic damages award.

In examining past cases, this court has found no instances where a jury has awarded, or a New York court has upheld, a verdict as large as $150,000,000 for non-economic damages in a defamation case.  See Cantu II, 341 Fed. App'x at 696 (noting that $150,000,000 is "a figure significantly greater than any previous award for non-economic damages in a defamation case in New York"); but see Sack & Tofel, First Steps Down the Road Not Taken: Emerging Limitations on Libel Damages, 90 Dick. L. Rev. 609, 611 (1986) ("[M]illion-dollar-plus awards have become routine.") (collecting cases).

New York courts have approved at least one multi-million-dollar damages award in a defamation case.  In the case of Prozeralik v. Capital Cities Commc'ns, Inc., a television station and a radio station both falsely identified a prominent local businessman as the victim of an abduction and beating, and falsely stated that the F.B.I. was investigating the possibility that the businessman owed a debt to organized crime figures.

21

82 N.Y.2d 466, 470-71, 626 N.E.2d 34, 36 (1993) ("Prozeralik II").  After a jury trial, plaintiff was awarded $1,487,525 to compensate for his direct financial losses,[7] as well as $4,000,000 to compensate for non-economic injuries, including mental suffering and damage to plaintiff's reputation. Prozeralik I, 188 A.D.2d at 185, 593 N.Y.S.2d at 667.  On appeal, the appellate division held that this award did not "deviate[] materially from what would be reasonable compensation."  Id.  In doing so, the court explained that it found several factors to be important.  Prozeralik I, 188 A.D.2d at 184-85, 593 N.Y.S.2d at 667.  First, the appellate division found it significant that the plaintiff owned several businesses in the area, and that his businesses depended upon his reputation within the community.  Id.  Second, the appellate division found that a reputation for being involved in organized crime would tend to cause plaintiff's customers to withdraw their financial support from plaintiff's businesses.  Id. Third, the appellate division noted that defendant did not challenge the additional award of $1,487,525 for direct financial loss.  Id.  Taken together, these considerations led

---

[7] Defendant did not challenge the $1,487,525 award for economic losses on appeal.  Prozeralik v. Capital Cities Commc'ns, Inc., 188 A.D.2d 178, 185, 593 N.Y.S.2d 662, 667 (4th Dep't 1993) ("Prozeralik I"), rev'd on other grounds, 82 N.Y.2d 466, 480, 626 N.E.2d 34, 42, 605 N.Y.S.2d 218, 226.

the appellate division to uphold the award of $4,000,000 for non-economic injuries.

After the case was remanded on other grounds, the appellate division once again upheld an even larger award of compensatory damages. Prozeralik IV, 222 A.D.2d at 1020, 635 N.Y.S.2d at 914. According to the appellate division, it was acceptable to award plaintiff $1,500,000 for direct financial loss, $6,000,000 for non-economic "injury to the plaintiff's reputation and standing in the community," and $3,500,000 for non-economic emotional harm.[8] Prozeralik v. Capital Cities Commc'ns, Inc., No. 48424, 1995 WL 17810583 (Sup. Ct., Niagara County March 24, 1995) ("Prozeralik III"); Prozeralik IV, 222 A.D.2d at 1020, 635 N.Y.S.2d at 914.

Although the Prozeralik case may provide some significant guidance, it must be noted that Cantu has suffered $38,000,000 in economic damages, an amount far in excess of the $1,500,000 directly lost by the plaintiff in Prozeralik. Prozeralik III, 1995 WL 17810583; see also Asbestos Litig., 9 F. Supp. 2d at 311 ("Prior awards . . . are regarded by the . . . courts performing § 5501(c) review as not binding but instructive.").

---

[8] The trial court also awarded plaintiff $500,000 in punitive damages, but the appellate division vacated this award. Prozeralik III, 1995 WL 17810583; Prozeralik IV, 222 A.D.2d at 1020, 635 N.Y.S.2d at 914. According to the appellate division, plaintiff had not acted with the level of malice required to sustain a punitive damages award. Id.

Additionally, Cantu's businesses within the petroleum industry were more lucrative than the businesses at issue in Prozeralik, and vulnerable to larger losses.  The evidence at trial indicated that Cantu's businesses had already lost contracts for $289,950,000 and $69,000,000 due to the defamation, underscoring the susceptibility of Cantu's businesses to further multi-million-dollar losses.  Furthermore, in contrast to the defendant's conduct in Prozeralik, Flanigan made his false statements in the course of an attempted criminal extortion. Therefore, although the Prozeralik case is instructive, the $9,500,000 award for non-economic damages accepted in that case does not represent the upper-limit for a defamation award in this particular case.

Again, the key question in this case is whether an award of $150,000,000 to Cantu "deviates materially from what would be reasonable compensation."  N.Y. CPLR § 5501(c).  In making this determination, this court acknowledges that this award is larger than any other defamation award approved by New York courts, and more than fifteen times as large as the amount accepted in Prozeralik.  See Prozeralik IV, 222 A.D.2d at 1021, 635 N.Y.S.2d at 915.  Nevertheless, as explained previously, the lack of precedent for an award of this magnitude does not foreclose the possibility that the verdict is permissible under N.Y. CPLR

§ 5501(c).  However, the lack of New York precedent indicates that this particular verdict must be closely scrutinized.

Even though the Prozeralik case ultimately led to an award of only $9,500,000 for non-economic damages, the award upheld in that case helps to illustrate the relationship between economic and non-economic damages.  In Prozeralik, the appellate division accepted an award of $6,000,000 for damage to plaintiff's reputation, in addition to another $3,500,000 to compensate for plaintiff's emotional harm, even though the lower court had previously held that plaintiff suffered no more than $1,500,000 in direct financial losses.  Prozeralik III, 1995 WL 17810583; Prozeralik IV, 222 A.D.2d at 1020, 635 N.Y.S.2d at 914.  This indicates that an award valued at more than six times the amount of economic losses calculated at trial is not necessarily unreasonable compensation for injury to plaintiff's reputation.  See also Lundell Mfg. Co. v. Am. Broad. Co., 98 F.3d 351, 364-66 (8th Cir. 1996) (upholding a jury's award of $158,000 in damages for past and future lost profits, as well as $900,000 in damages for separate "injury to reputation," even though the award for damage to reputation was valued at more than five times the amount of past and future lost profits).  This is significant because Cantu's award for non-economic damages – the award

25

presently under consideration – is approximately four times the amount of his economic losses.

Applying the reasoning in <u>Prozeralik</u> to the case before this court, the award of $150,000,000 does not "deviate[] materially from what would be reasonable compensation." N.Y. CPLR § 5501(c).  Given the magnitude of the proven economic losses Cantu suffered, as well as the egregious nature of the defamation, it cannot be said that the jury's award of $150,000,000, approximately four times the amount of economic damages, deviated materially from reasonable compensation. Proportionally, this is actually less than the amounts approved in the <u>Prozeralik</u> and <u>Lundell</u> cases, which respectively awarded approximately six and five times as much for non-economic damages as they awarded for economic damages.  See <u>Prozeralik III</u>, 1995 WL 17810583; <u>Lundell</u>, 98 F.3d at 364-66.  Furthermore, there has been evidence demonstrating that the injury to Cantu's reputation led to lost contracts valued at $289,950,000 and $69,000,000, which underscores the severity of the damage to Cantu's reputation.  After further considering that Flanigan's conduct was part of a larger scheme of criminal extortion, that the inflammatory accusations were presented in a credible medium and that the defamation was distributed throughout the world, this court cannot say that the jury's award of $150,000,000 for

26

this plaintiff "deviates materially from what would be

reasonable compensation" under N.Y. CPLR § 5501(c).  Therefore,

the jury's award for non-economic damages is affirmed.

Dated:      Brooklyn, New York
            April 14, 2010

                              SO ORDERED:

                              _____
                                        /s/
                              David G. Trager
                              United States District Judge

27

```
Copy Mailed To:

Billy R. Flanigan
8600 WestPark
Suite 107
Houston, TX 77063
```